TRUST UNDER WILL OF ABNER J. TOWER, EDWARD A. TAFT, FRANCIS C. GRAY, BOSTON SAFE DEPOSIT AND TRUST COMPANY, TRUSTEES, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 6420.    Promulgated July 11, 1945.

*Kenneth W. Bergen, Esq.*, for the petitioner.
*Joseph D. Donohue, Esq.*, for the respondent.

386

OPINION.

BLACK, *Judge*: We have but one issue to decide in this proceeding and that is whether the 750 shares of preferred stock acquired by the A. J. Tower Co. from petitioner July 2, 1941, were acquired by it as a partial liquidation, as that term is defined in the applicable statute, or whether they were acquired as an ordinary purchase by a corporation of its own stock, to be held as an asset in its treasury for the purpose of subsequent reissue.

If the transaction amounted to a partial liquidation, then petitioner must take into its income account 100 percent of its gain. If it was an ordinary purchase and sale and not a partial liquidation, then petitioner has to take into its income account only 50 percent of the gain, since it had owned and held the shares of stock for a period of more than 10 years prior to its transfer in 1941. The provision requiring gains from partial liquidations to be treated as short term capital gains only was repealed by the 1942 Act (sec. 147, amending I. R. C. sec. 115 (c)). However, it was in full force and effect during the year 1941, which is the year we have before us. The applicable statute as it was prior to its amendment by the 1942 Act is printed in the margin.[1]

---

[1] SEC. 115. [I. R. C.] DISTRIBUTIONS BY CORPORATIONS.

\* \* \* \* \* \* \*

(c) DISTRIBUTIONS IN LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. Despite the provisions of section 117, the gain so recognized shall be considered as a short-term capital gain, except in the case of amounts distributed in complete liquidation. For the purpose of the preceding sentence, "complete liquidation" includes any one of a series of distributions made by a corporation in complete cancellation or redemption of all of its stock in accordance with a bona fide plan of liquidation and under which the transfer of the property under the liquidation is to be completed within a time specified in the plan, not exceeding, from the close of the taxable year during which is made the first of the series of distributions under the plan, (1) three years, if the first of such series of distributions is made in a taxable year beginning after December 31, 1937,

There is a line of cases which hold that where a corporation acquires its stock not for the purpose of cancellation and retirement, but for the purpose of holding it as an asset in its treasury for subsequent reissue for some corporate purpose, the transaction between the corporation and its stockholder is one of purchase and sale and for income tax purposes is to be treated as such and not as a partial liquidation. See *Alpers* v. *Commissioner*, 126 Fed. (2d) 58; *William A. Smith*, 38 B. T. A. 317; *W. C. Robinson*, 42 B. T. A. 725; and *R. W. Creech*, 46 B. T. A. 93.

On the other hand, there is a line of cases which hold that where a corporation purchases a portion of its own stock for the purpose of cancellation and retirement the seller receives a distribution in partial liquidation, and this is so even though the seller may not know that his stock is being purchased for cancellation and retirement. See *Cohen Trust* v. *Commissioner*, 121 Fed. (2d) 689; *Hill* v. *Commissioner*, 126 Fed. (2d) 570; *Hamilton Allport*, 4 T. C. 401, now on review by the Seventh Circuit; *Williams Cochran*, 4 T. C. 942; and *L. B. Coley*, 45 B. T. A. 405; appeal dismissed by the Fifth Circuit.

Petitioner contends that the facts of the instant case bring it within the ambit of the first group of cases above cited, whereas the Commissioner contends that the case falls within the ambit of the second group of cases cited. We think the Commissioner must be sustained on the strength of the evidence which we have before us.

In the first place, we think, in deciding the question of intent it must be borne in mind that the very purpose of the reorganization of the A. J. Tower Co. in 1926 was the adoption of a plan whereby the ownership of the corporation by the trust was to gradually cease and the trust beneficiaries were to become the owners of the company. An important part of this plan was the issuance of 10,000 shares of preferred stock to the trust, with a definite provision that each year after 1928, where the profits were sufficient, the corporation was to set aside $50,000 as a sinking fund for the acquirement of 500 shares of preferred stock in that year and the stock when so acquired was to be canceled and was never to be reissued. In addition to this mandatory requirement that $50,000 of the profits in each year should be used for the purchase of preferred stock for the sinking fund, there was also a provision that "the Directors may use and apply any portion of the surplus of the corporation or its net profits in the purchase of the

or (2) two years, if the first of such series of distributions was made in a taxable year beginning before January 1, 1938. * * *

   •      •      •      •      •      •      •

(1) DEFINITION OF PARTIAL LIQUIDATION.—As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.

preferred stock, to such extent and in such manner and upon such terms as the Directors may determine."

On July 2, 1941, the corporation purchased from petitioner 750 shares of its preferred stock. These shares were purchased under an authorization set out in our findings of fact and were carried on the corporation's books for the remainder of that year as "treasury stock" and were not canceled and retired until the following year, 1942, as detailed in our findings of fact. However, we do not think these latter facts have any important significance when all the facts and circumstances are taken into consideration.

In the first place it is clear that the corporation was under an obligation, well known to its directors, to purchase 500 shares of the corporation's preferred stock at sometime in that year in order to comply with the sinking fund provision. As a matter of fact, due to an error made by its bookkeeper in a prior year, the company was under an obligation to purchase for the sinking fund 667 shares in 1941, instead of 500 shares. How this error occurred in a prior year is detailed in our findings of fact and it is unimportant to repeat them here. Regardless of whether the board of directors of the corporation thought in 1941 that only 500 shares of the preferred stock had to be purchased for the sinking fund or whether they thought 667 shares had to be purchased for that purpose, we think the whole 750 shares were purchased as a part of the general plan put into effect in 1926 to ultimately acquire the whole of the corporation's 10,000 shares of preferred stock and cancel and retire it.

The corporation declared two dividends on its common stock in 1941. Certainly if the sinking fund requirements for 1941 had not been met the corporation would have had no legal right to declare the dividends on its common stock. It seems only reasonable to assume that when the corporation acquired the 750 shares of preferred stock July 2, 1941, it fully intended to meet its sinking fund requirements for that year and perhaps to exceed them, which it had a right to do. And even though its board of directors did honestly believe at the time of purchase, July 2, 1941, that only 500 shares were required for the sinking fund for 1941, nevertheless it seems to us they were only exercising the right provided in the charter to acquire other shares when the company had surplus funds with which to do it. This was nothing unusual. The company, apparently in other prior years as shown in our findings of fact, had purchased more than its sinking fund requirements. None of such purchases were ever reissued. It seems to us it would be unrealistic to hold, under all the evidence which is in the record, that the 750 shares in question were in fact purchased for any other purpose than ultimate cancellation and retirement.

It is true that at the hearing the corporation's president, who was also one of its directors, testified in substance with reference to the

purchase of the 750 shares that the board of directors of the company considered it advisable not to transfer the stock direct to the sinking fund account, but to hold it in its treasury, because it anticipated that it might need additional cash to fulfill Government contracts for goods produced by the company; that from the company's experience in the last war greater working capital was needed to carry out Government contracts because (1) the Government does not pay its bills as promptly as regular customers, (2) larger inventories were required to manufacture goods ordered by the Government, and (3) additional manufacturing facilities might be required; that it was thought that by holding the 750 shares of preferred stock in its treasury rather than its sinking fund account the company would have an additional source from which it could obtain cash in the future should it need it; and that at the time the 750 shares were purchased by the company it was not known whether those shares would eventually be transferred to the sinking fund or whether they would be sold to supply the company with additional working capital.

We have no disposition to question the good faith of the testimony of the corporation's president to which we have just referred. The board of directors may well have had in mind the possibility that they might use all or a part of the 750 shares in the manner which he indicated. However, the fact remains. we think, that this was a mere possibility and that the primary and controlling purpose of the board of directors in directing the purchase of the 750 shares in question was for the ultimate cancellation and retirement of the shares, either through the sinking fund or otherwise. This accords with the general plan of purchase and retirement of the preferred shares which had existed since 1926 and which was fully consummated in 1942 by the cancellation and retirement of all the remaining shares.

A statement in our findings of fact shows the details of these purchases and retirement of the 10,000 shares of preferred stock over the period of years, and this statement shows that none of the stock was ever reissued. It seems to us that it would be wholly unrealistic, in the face of all the evidence which is in the record, to hold that the particular 750 shares purchased in 1941 were purchased for the purpose of resale and reissue to future stockholders. The fact that these shares were carried in the company's accounts as "treasury stock" until in March 1942, when all but 83 of the shares were transferred to the sinking fund, we think is without any important significance in view of all the other evidence in the record.

Respondent's determination is sustained.

*Decision will be entered for the respondent.*